Steven M. Wilker, OSB No. 911882
  Direct Dial:  503.802.2040
  Fax:  503.972.3740
  E-Mail:  steven.wilker@tonkon.com
David S. Aman, OSB No. 962106
  Direct Dial:  503.802.2053
  Fax:  503.972.3753
  E-Mail:  david.aman@tonkon.com
**TONKON TORP LLP**
1600 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR  97204

        Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

Portland Division

**OBSIDIAN FINANCE GROUP, LLC and
KEVIN D. PADRICK,**

                            Plaintiffs,

        v.

**CRYSTAL COX,**

                    Defendant.

Civil No. CV 11-0057 HZ

**PLAINTIFFS' OPPOSITION TO
MOTION FOR NEW TRIAL**

## Table of Contents

I.     INTRODUCTION ................................................................................... 1

II.    STANDARD GOVERNING NEW TRIAL MOTION ............................... 3

III.   THE COURT PROPERLY INSTRUCTED THE JURY AND, IN ANY EVENT,
       DEFENDANT COX DID NOT PRESERVE THE OBJECTIONS THAT SHE
       NOW ASSERTS ..................................................................................... 4

       A.    Cox did not preserve any objections to the jury instructions. ................ 4

       B.    The Court should not order a new trial based on the "plain error" doctrine .......... 7

       C.    The Court correctly concluded that the First Amendment was not
             implicated by Cox's defamatory statements about plaintiffs ................ 10

             1.    Gertz does not apply here. ...................................................... 10

             2.    Defendant's Statements Did Not Involve Matters of Public
                   Concern. ............................................................................ 16

             3.    Neither Padrick nor Obsidian is a Public Official ..................... 19

IV.    THE COURT SHOULD NOT DISTURB THE JURY'S DAMAGES AWARD ........... 21

V.     THE COURT CORRECTLY RULED THAT THE MEDIA SHIELD LAW
       DOES NOT APPLY IN THIS CASE ........................................................ 23

VI.    THE COURT CORRECTLY CONCLUDED THAT OREGON'S
       RETRACTION STATUTE DOES NOT APPLY HERE ............................... 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**U.S. SUPREME COURT CASES**

*Austin v. Michigan Chamber of Commerce,*
    494 U.S. 652 (1990)......................................................................................15

*Citizens United v. Federal Election Commission,*
    130 S.Ct. 876 (2010)..............................................................................14, 15

*Connick v. Myers,*
    461 U.S. 138 (1983).....................................................................................16

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,*
    472 U.S. 749 (1985)............................................................................. passim

*Gertz v. Robert Welch, Inc.,*
    418 U.S. 323 (1974)............................................................................. passim

*Hutchinson v. Proxmire,*
    443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979)..........................18, 20

*Milkovich v. Lorain Journal Co.,*
    497 U.S. 1 (1990).........................................................................1, 13, 14, 15

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964)..............................................................................13, 19

*Palmer v. Hoffman,*
    318 U.S. 109, 63 S.Ct. 477 (1943)..................................................................4

*Philadelphia Newspapers, Inc. v. Hepps,*
    475 U.S. 767 (1986)............................................................................. passim

*Rosenblatt v. Baer,*
    383 U.S. 75 (1966) (concurring).....................................................................1

*Snyder v. Freight Const, Local No. 287,*
    175 F.3d 680 (9th Cir.), *cert. denied*, 528 U.S. 926 (1999)........................21

**OTHER FEDERAL CASES**

*D&S Redi-Mix v. Sierra Redi-Mix & Contracting Co.,*
    692 F.2d 1245 (9th Cir. 1982) ......................................................................21

*Freund v. Nycomed Amersham,*
   347 F.2d 752 (9th Cir. 2003) .................................................................3

*Gardner v. Martino,*
   563 F.3d 981 (9th Cir. 2009) ..........................................................17, 18

*Guidance Endodontics, LLC, v. Dentsply Int'l, Inc.,*
   749 F.Supp.2d 1235 (D. N.M. 2010) .................................................3, 7

*Libbey-Owens-Ford Co. v. Ins. Co. of North America,*
   9 F.3d 422 (6th Cir. 1993) ...............................................................4, 6

*Medtronic v. White,*
   526 F.3d 487 (9th Cir. 2008) ...............................................................6

*Newcombe v. Adolf Coors Co.,*
   157 F.3d 686 (1998).....................................................................14, 15

*Seymour v. Summa Vista Cinema, Inc.,*
   809 F.2d 1385 (9th Cir. 1987), *amended on other grounds,* 817 F.2d 609 (9th Cir.
   1987) ......................................................................................21

*Straw v. Revel,*
   813 F.2d 356 (11th Cir. 1987) ............................................................18

*Voohries-Larson v. Cessna Aircraft Co.,*
   241 F.3d 707 (9th Cir. 2001) (in case prior to 2003 amendments, noting there was no
   plain error review in civil cases and referring to the Ninth Circuit as the "strictest
   enforcer of Rule 51") ........................................................................7

*Weeks v. Bayer,*
   246 F.3d 1231 (9th Cir. 2001) ............................................................16


### OTHER STATE CASES

*Bandelin v. Pietsch,*
   98 Idaho 337, 563 P.2d 395 (1977).......................................................20

*HBO v, Harrison,*
   983 S.W.2d 31 (Tex. App. 1998).........................................................19

### STATUTES

ORS 31.150(2).................................................................................17

ORS 31.150.................................................................................17, 18

ORS 31.210.....................................................................................................................24, 25

ORS 44.510(2)........................................................................................................................24

ORS 44.510 *et seq.*...............................................................................................................23

ORS 44.530(3).......................................................................................................................24

**OTHER AUTHORITIES**

First Amendment ............................................................................................................ passim

FRCP 51 ......................................................................................................................... passim

FRCP 51(a)(1) ..........................................................................................................................6

FRCP 51(b)(2)(A) .....................................................................................................................4

FRCP 51(d)(1) ..........................................................................................................................5

FRCP 51(d)(1)(A) .....................................................................................................................6

## I.   INTRODUCTION

As Supreme Court Justice Potter Stewart once explained:

> The right of a man to the protection of his own reputation
> from unjustified invasion and wrongful hurt reflects no more
> than our basic concept of the essential dignity and worth of every
> human being -- a concept at the root of any decent system of
> ordered liberty.

> * * * *

> The destruction that defamatory falsehood can bring is, to
> be sure, often beyond the capacity of the law to redeem. Yet,
> imperfect though it is, an action for damages is the only hope for
> vindication or redress the law gives to a man whose reputation
> has been falsely dishonored.[1]

That is precisely why plaintiffs brought this action for damages: to obtain the
only remedy the law provides to vindicate them from the significant damage caused by Cox's
false accusations of criminal conduct. Plaintiffs and this court invested substantial time, effort
and expense in preparing for and conducting the trial in this matter. Defendant Cox was given
a full and fair opportunity to present her case. The court properly instructed the jury on the law
concerning defamation—without any objection from the defendant—and the jury returned a
verdict in plaintiffs' favor that was fully supported by the evidence. Defendant Cox now asks
this court to force plaintiffs to prove their case to the jury yet again. There is no reason to do
so.

Remarkably, defendant Cox seeks to have the court and plaintiffs go through the
time and expense of a new trial so that the jury can consider whether she acted negligently
and/or maliciously when she falsely accused plaintiffs of criminal conduct. We say
remarkably because just one day before trial, Cox willfully disobeyed this court's order to bring
to Court documents requested by plaintiffs that were directly relevant to her negligence and

---

[1]   *Rosenblatt v. Baer*, 383 U.S. 75, 92-93 (1966) (concurring), *quoted in Milkovich v.
Lorain Journal Co.,* 497 U.S. 1, 22-23 (1990).

PAGE 1 – PLAINTIFFS' OPPOSITION TO MOTION FOR NEW TRIAL

malice—that is, to the issues she now claims are so critical to the case that justice demands she been given a new trial so the jury may consider them.

Cox's willful disobedience of the court's order came only after she failed to show up at a properly noticed deposition and failed to respond to discovery requests, forcing plaintiffs to file a motion to compel and for sanctions—a motion that was granted.  We ask the court to bear defendant's willful misconduct in mind when it considers whether to exercise its discretion to order a new trial for defendant's benefit.  Even without the discovery she wrongfully withheld, there was and is overwhelming evidence that she acted negligently and with malice.  Indeed, the evidence showed that after she received a cease and desist letter, she reposted allegations of serious criminal conduct initially made by a person clearly motivated to damage plaintiffs, and did so without conducting any further investigation.  She then tried to use the damage caused by those allegations (and other allegations she made) as leverage to extort money from the plaintiffs.

In her motion for new trial, Cox first complains about the jury instructions.  The court correctly concluded that the First Amendment was not implicated by defendant's false statements about plaintiffs.  It then properly gave Oregon's Uniform Civil Jury Instruction on defamation.  Cox failed to provide any proposed jury instructions of her own nor did she object to the instructions as given.  She therefore waived any objections she could have made under FRCP 51.  In any event, the legal arguments Cox presents now were considered and rejected by the Court in connection with the "defenses" raised in defendant's trial memorandum, with the exception of her new argument that certain protections for media defendants in defamation actions be extended to all defamation defendants.  Finally, this is not one of the rare cases where the court should invoke its discretionary authority for "plain error" review under FRCP 51 even if the court were to conclude that it made an error.

Cox next complains that the damages awarded by the jury were excessive.  There was powerful evidence of the significant damage Cox's defamatory posting caused to

PAGE 2 –  PLAINTIFFS' OPPOSITION TO MOTION FOR NEW TRIAL

plaintiffs' reputations, which easily supported the damage awards. The false charges of criminal misconduct she made against the plaintiffs were extremely serious. There was lay and expert testimony of the damage that these statements would normally cause and did cause to plaintiffs, particularly given the nature of plaintiffs' business and the reach and permanence of the statements on the internet. The jury's awards of $1 million to Obsidian and $1.5 million to Padrick were fully supported by the evidence.

Amicus curaie EFF raises two additional issues in its brief—application of Oregon's media shield law and retraction statute. The court's rulings on these two issues were correct, as discussed in Sections V and VI below.

For all of the reasons, the Court should let the jury verdict stand and deny defendant's motion for new trial.

## II.     STANDARD GOVERNING NEW TRIAL MOTION

The decision to grant or deny a new trial is committed almost entirely to the trial judge's discretion, given the trial judge's familiarity with the context of the trial. *Freund v. Nycomed Amersham*, 347 F.2d 752, 764-65 (9th Cir. 2003). Nevertheless, motions for a new trial are generally disfavored and should be granted with great caution, limited to situations where there is substantial and prejudicial error to the party seeking the new trial. *Guidance Endodontics, LLC, v. Dentsply Int'l, Inc.*, 749 F.Supp.2d 1235, 1256 (D. N.M. 2010).

In this case, defendant Cox has based her motion for new trial on two separate grounds. First, she claims that there were erroneous jury instructions given. Second, she claims that the damages awarded were excessive in light of the evidence. The relevant standards for each ground are discussed in further detail below.

III.   **THE COURT PROPERLY INSTRUCTED THE JURY AND, IN ANY EVENT, DEFENDANT COX DID NOT PRESERVE THE OBJECTIONS THAT SHE NOW ASSERTS**

A.   **Cox did not preserve any objections to the jury instructions.**

This court properly instructed the jury on the law of defamation, even in light of the new arguments defendant makes in her motion for new trial, as we will explain in Section III.C below.  Nevertheless, before considering the substance of her objections, the court must first consider whether defendant may raise any objections to the jury instructions at this time and, if so, on what grounds.

The starting place for considering whether Cox preserved her right to seek a new trial based on her current objections to the jury instructions is FRCP 51.  That Rule provides clear and strict guidelines for how and when a party must request or object to an instruction in order to preserve an objection to the instructions as given.

First, the Rule details *how* a party must object to a jury instruction in order for the objection to be preserved.  It provides that a party who "objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection."  The objection must be sufficiently specific to bring into focus the precise nature of the alleged error.  *Palmer v. Hoffman*, 318 U.S. 109, 119, 63 S.Ct. 477 (1943).  And a party may not state one ground for objection during trial and then state a different ground on a motion for new trial.  *See Libbey-Owens-Ford Co. v. Ins. Co. of North America*, 9 F.3d 422, 427 (6th Cir. 1993).

Next, FRCP 51 makes clear *when* a party must object in order for the objection to be timely.  It requires that the party object on the record before the instructions are given, if the court allows an opportunity for such an objection (as the court did here).  FRCP 51(b)(2)(A).

Finally, the Rule provides for the limited circumstances under which a party may claim that the court erred in giving or refusing to give an instruction.  A party may claim

PAGE 4 –  PLAINTIFFS' OPPOSITION TO MOTION FOR NEW TRIAL

error (a) for an instruction given, only if it properly objected to that instruction and (b) for an instruction not given, only if the party both requested the instruction and properly objected to the instruction not being given (unless the court rejected the request in a definitive ruling on the record).  FRCP 51(d)(1).

With these guidelines in mind, Cox is precluded from claiming that the court erred in the instructions it gave.  First, Cox did not object to the jury instructions that the court gave.  The court provided Cox with a clear opportunity, as contemplated by Rule 51, to object to the instructions as given during a pre-charging conference.  She did not object, as demonstrated by the following exchange which occurred after the evidence was closed but before the jury was instructed:

> **COURT:**  **By the way, Ms. Cox, did you have an opportunity to review the plaintiffs' requested jury instructions?**
>
> **COX:**  **I don't – I'm not in full understanding of it, but yes, I have read it.**
>
> **COURT:**  **And do you have any specific objections to any of their instructions, other than the ones I have made myself?**
>
> **MS. COX:**  **No.  I don't feel I – no, I do not.**
>
> **COURT:**  **Okay.  We'll get those to you in a minute.  It will show you exactly what we're going to give to the jury.  You may refer to them in your closing arguments if you think it's helpful to you.**

(11/29/11 Tr., 182:20 – 183:7).  The court then provided a copy of the written jury instructions to defendant Cox and asked again:

> **COURT:**  **Do you have any objections to the requested instructions?**
>
> **MS. COX:**  **No, Your Honor.**

(11/29/11 Tr., 184:15-17).  The court <u>twice</u> asked defendant whether she had any objections to the instructions that were to be given and both times she said no.  Rule 51 precludes her from objecting now.

Defendant suggests in her motion for new trial that the "defenses" raised in her trial memorandum were sufficient to preserve the objections she now makes to the instructions.  (Def. Memo. at 7).  She is wrong.  To the extent she claims her "defenses" were objections to the instructions as given, those objections were not properly made for the reasons described above.  To the extent she claims they were objections to the failure to give a requested instruction, they were not.  FRCP 51 provides that a party may object to the failure to give an instruction only if the party "properly requested it."  FRCP 51(d)(1)(A).  The Rule makes clear how a party must request an instruction: "At the close of the evidence or at any earlier reasonable time that the court orders, a party may file and furnish to every other party written requests for the jury instructions it wants the court to give."  FRCP 51(a)(1).  Here, the court issued a jury trial management order that required the parties to provide their proposed jury instructions by November 22, 2011.  (Docket No. 39, p. 2).  Cox did not provide a single proposed jury instruction at that time or any other time, which precludes her from complaining that the court failed to give any particular instruction.  *See also Medtronic v. White*, 526 F.3d 487, 495 (9th Cir. 2008) (futility exception to Rule 51 applies only where, among other things, "the party offered an alternative instruction").[2]

Finally, even if the court finds that the "defenses" she raised were sufficient to constitute objections to the jury instructions as given, FRCP 51 does not allow her to raise new grounds at this point, as she does in her motion for new trial.  *See Libbey-Owens-Ford Co.,*

---

[2]    The court should not relax the standards in FRCP 51 simply because defendant was not represented by counsel.  First, the requirements of the Rule are clear as were the instructions in the Court's jury trial management order.  Second, defendant appears to have made a conscious decision not to get a lawyer, in an apparent effort to inject "new elements" in the case after trial.  *See* Exhibit 1 hereto.

*supra*, 9 F.3d at 427.  The primary thrust of defendant's new trial motion is that the First

Amendment does not distinguish between media and non-media defendants and that, as a

result, a non-media defendant is entitled to the same protection under the law as media

defendants—that is, a private plaintiff suing a non-media defendant must prove fault (at a

minimum negligence) in order to prove defamation.  *See* Section III.C below.  Not only would

that rule be an extension of current law, but importantly, for purposes of FRCP 51, this was not

one of the grounds defendant raised in her trial memorandum.  Up until now, as the Court's

November 30, 2011 Opinion recognizes, defendant has argued that she is "media" and that,

therefore, the First Amendment applies to her statements.  (11/30/11 Opinion, at 9).  By

contrast, defendant now argues that the First Amendment effectively applies to all speakers

whether they are media or not, even where the plaintiff is a private party and the speech does

not involve a matter of public concern.  Because that ground was never raised before the

motion for new trial, defendant is precluded from raising it now even if the court decided to

consider her objections to the jury instructions at all.

      **B.**     **The Court should not order a new trial based on the "plain error" doctrine**

      FRCP 51 does now allow the court, in its discretion, to consider an untimely

objection to a jury instruction if the court concludes that it committed "plain error."  As one

court recently noted, "plain error review of jury instructions 'presents an extraordinary, nearly

insurmountable burden' on the party challenging the jury's verdict."  *Guidance Endodontics,*

*supra,* 749 F.Supp.2d at 1256, *quoting Royal Maccabees Life Ins. Co. v. Choren*, 393 F.3d

1175, 1182 (10th Cir. 2005).[3]

---

[3]     Indeed, the Ninth Circuit did not even recognize the plain error exception for jury
instructions prior to the amendments to FRCP 51 in 2003 which authorized discretionary plain
error review.  *See Voohries-Larson v. Cessna Aircraft Co.*, 241 F.3d 707, 713-14 (9th Cir.
2001) (in case prior to 2003 amendments, noting there was no plain error review in civil cases
and referring to the Ninth Circuit as the "strictest enforcer of Rule 51").

PAGE 7 –  PLAINTIFFS' OPPOSITION TO MOTION FOR NEW TRIAL

To invoke the exception at all, the court must first conclude that (1) an error was made, (2) the error was obvious, clear or plain, and (3) the error affected substantial rights and would result in a fundamental miscarriage of justice if a new trial is not ordered. *See Settlegoode v. Portland Public* Schools, 371 F.3d 503, 517 (9th Cir. 2004). Even upon such a showing, the court still has wide discretion to grant or deny the motion, and in doing so may consider, among other things, the obviousness of the mistake, the importance of the error, the costs of correcting the error and, in a close case, the impact on non-parties. *See* Advisory Notes to 2003 Amendments to FRCP 51**.** An error may be deemed "plain" only if the court concludes that the proper course was clear and obvious under the current law—if the law is unsettled or uncertain, the error cannot be plain. *See Franklin Prescriptions, Inc. v. New York Times Co.,* 424 F.3d 336, 342-43 (3rd Cir. 2005) (citing cases).

This is not one of the rare cases that justifies invoking the plain error rule in FRCP 51. First, there was no error made. The court correctly concluded that the First Amendment was not implicated by defendant's conduct and properly instructed the jury using Oregon's Uniform Civil Jury Instruction, with no objection from defendant. Even if the Court were to conclude otherwise now, any error was not plain or obvious, as will be explained in more detail in Section III.C below.

Second, even if the court were to conclude that it made an error and that the error was plain, it should not exercise its discretion to order a new trial under the extremely narrow "plain error" rule. As discussed above, Cox willfully disobeyed the court's discovery order by refusing to produce documents that would bear on the issues of negligence and malice, the very issues that she now claims should have been decided by the jury. (11/28/11 Tr., 7:24 – 9:6). She should not be granted a new trial to present evidence and argument

concerning her supposed investigation and her state of mind when she willfully refused to provide relevant documents on those issues when ordered to do so.[4]

      Moreover, Cox has not been prejudiced because the evidence before the jury and provided to the court in pre-trial submissions was overwhelming that Cox performed no investigation of the truth of the statements she made about plaintiffs and that she acted maliciously. The evidence showed that Cox received a cease and desist letter, and responded by reposting allegations of criminal conduct to be, in her words, "flippant." (11/29/11 Tr., 169:13-15, 170:14 – 171:7). She openly admitted that the only source of the allegations was another blog written by Stephanie Studebaker. (*Id.*, 50:11-15). Studebaker is the daughter of the one of the Summit principals who herself had benefitted from the money stolen from the creditors—in other words, she was someone who was clearly biased against plaintiffs and had every incentive to provide false information about them. (*Id.*, 94:20-22). Despite the questionable source of the information, Cox went ahead and reposted the serious allegations of criminal conduct, along with hundreds of other postings that had no basis. Cox admitted she had no idea whether her allegations of criminal conduct were true or false as late as the day before trial—almost one year after she made the posting. (*Id.*, 169: 5-7 (admitting she did not know the proper tax treatment of a liquidating trust)). Finally, and perhaps most importantly, the evidence showed that she used the defamatory posting in an effort to extort plaintiffs by offering to repair the reputations she had damaged in exchange for being paid. (Trial Ex. 31).

      Given the powerful evidence of Cox's negligence and malice and her willful disobedience of the court's order to produce documents relevant to those issues, the court should not invoke the exceptional remedy under the plain error doctrine here even if the court were to conclude that it committed plain error.

---

[4]    Indeed, one of the sanctions the court considered was taking issues away from the jury. (1/28/11 Tr., 15:5-24). Since the court ruled that negligence and malice were not part of plaintiffs' burden in this case, it did not need to consider that issue further.

PAGE 9 – PLAINTIFFS' OPPOSITION TO MOTION FOR NEW TRIAL

C.    **The Court correctly concluded that the First Amendment was not implicated by Cox's defamatory statements about plaintiffs**

1.    *Gertz* **does not apply here.**

This court correctly concluded that plaintiffs are private figures, that they did not need to prove fault in order to recover for defamation here, and that the jury could presume damages to plaintiffs' reputations.  Defendant's argument that *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), controls here is incorrect, both because Cox's defamatory postings did not involve a matter of public concern and because she is not a media defendant.

In *Gertz*, the Supreme Court found that the plaintiff was neither a public official nor a public figure.  The Court declined to extend the *New York Times* actual malice standard to a claim by a private figure suing a media defendant, a magazine publisher, but did hold that the plaintiff in that circumstance needed to establish fault and that the plaintiff could not seek presumed or punitive damages without establishing actual malice.  But, as even the *amicus* brief submitted by EFF acknowledges, the *Gertz* decision requiring a showing of negligence by a private plaintiff against a media defendant was premised on the need to balance competing interests:  "It recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation, yet shields the press and broadcast media from the rigors of strict liability for defamation."  418 U.S. at 348.   That the Court was not considering or ruling on claims involving non-media defendants is made even clearer by the statement that follows:

> At least this conclusion obtains where, as here, the substance of the defamatory statement 'makes substantial danger to reputation apparent.' This phrase places in perspective the conclusion we announce today. Our inquiry would involve considerations somewhat different from those discussed above if a State purported to condition civil liability on a factual misstatement whose content did not warn a reasonably prudent editor or broadcaster of its defamatory potential. *Cf. Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). Such a case is not now before us, and we intimate no view as to its proper resolution.

PAGE 10 –  PLAINTIFFS' OPPOSITION TO MOTION FOR NEW TRIAL

*Id.* (emphasis added).

That *Gertz* did not constitutionalize the rules for all defamation claims by private figures is made clear by the Court's ruling in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985). In *Dun & Bradstreet*, the Court allowed an award of presumed and punitive damages under state law in a defamation claim by a private figure against a non-media defendant on a matter that was not of public concern. The three justices who joined in the plurality opinion by Justice Powell concluded that *Gertz* did not apply where the defamatory statement did not involve a matter of public concern. 472 U.S. at 762. Chief Justice Burger agreed and concurred in the judgment, but did not join the opinion of the plurality because he thought that *Gertz* had been wrongly decided and that the constitution imposed no limitations in private figure defamation claims. Justice White also concurred. He agreed with Chief Justice Burger that *Gertz* had been wrongly decided and that there should be no constitutional limits on private figure defamation claims. Justice White, however, did agree with the view expressed in Justice Brennan's dissenting opinion (for himself and three others) that the media was entitled to no greater protection than non-media defendants, but Justice White would have denied constitutionally imposed limits to both. Thus, while five justices apparently agreed with the idea that media defendants and other speakers should be subject to the same rules, they most certainly did not agree that the rule announced in *Gertz* should apply to protect defamation defendants from the application of state law standards to private plaintiff defamation claims. If they had, the dissent would have prevailed in *Dun & Bradstreet*. We know that it did not.

The following year the Court decided *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986). There, the issue was whether a state law requirement that a defamation defendant bear the burden of proving the truth of its statements could be constitutionally applied to a media defendant's statements involving matters of public concern. The Court first described the state of law as of that time:

PAGE 11 – PLAINTIFFS' OPPOSITION TO MOTION FOR NEW TRIAL

> One can discern in these decisions two forces that may
> reshape the common-law landscape to conform to the First
> Amendment. The first is whether the plaintiff is a public official
> or figure, or is instead a private figure. The second is whether the
> speech at issue is of public concern. When the speech is of public
> concern and the plaintiff is a public official or public figure, the
> Constitution clearly requires the plaintiff to surmount a much
> higher barrier before recovering damages from a media
> defendant than is raised by the common law. When the speech is
> of public concern but the plaintiff is a private figure, as in *Gertz,*
> the Constitution still supplants the standards of the common law,
> but the constitutional requirements are, in at least some of their
> range, less forbidding than when the plaintiff is a public figure
> and the speech is of public concern. When the speech is of
> exclusively private concern and the plaintiff is a private figure, as
> in *Dun & Bradstreet,* the constitutional requirements do not
> necessarily force any change in at least some of the features of
> the common-law landscape.

475 U.S. at 775.

The Court then concluded that requiring a media defendant to prove truth when

the plaintiff was a private figure and the published statements involved matters of public

concern was not consistent with the constitution. *Id.* at 776-77. And again, the Court's

rationale was premised on the breathing room needed by newspapers to publish without fear of

liability based on failing to meet a burden of proof. *Id.*

What is most significant, however, is how the Court couched its holding: "To

ensure that true speech on matters of public concern is not deterred, we hold that the common-

law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages

against a media defendant for speech of public concern." *Id.* at 776-77 (emphasis added).

Equally significant is what the Court noted it was not deciding:

> We also have no occasion to consider the quantity of proof of
> falsity that a private-figure plaintiff must present to recover
> damages. Nor need we consider what standards would apply if
> the plaintiff sues a nonmedia defendant, see *Hutchinson v.
> Proxmire,* 443 U.S. 111, 133, n. 16, 99 S.Ct. 2675, 2687, n. 16,
> 61 L.Ed.2d 411 (1979), or if a State were to provide a plaintiff
> with the opportunity to obtain a judgment that declared the
> speech at issue to be false but did not give rise to liability for
> damages.

PAGE 12 – PLAINTIFFS' OPPOSITION TO MOTION FOR NEW TRIAL

*Id.* at 779 n.4. Although Justice Brennan concurred to assert that media and non-media

defendants should be treated the same, only Justice Marshall joined the concurrence.

Four years after *Hepps*, the Court again described the state of the law

concerning constitutional limitations on state law defamation actions in *Milkovich v. Lorain*

*Journal Co.*, 497 U.S. 1 (1990). The Court, in a 7-2 decision, described *Hepps* as a rule

applicable to media defendants:

> Foremost, we think *Hepps* stands for the proposition that a
> statement on matters of public concern must be provable as false
> before there can be liability under state defamation law, at least
> in situations, like the present, where a media defendant is
> involved.[6]
>
> _____
>
> [6] In *Hepps* the Court reserved judgment on cases involving
> nonmedia defendants, see 475 U.S., at 779, n. 4, 106 S.Ct., at
> 1565, n. 4, and accordingly we do the same. Prior to *Hepps,* of
> course, where public-official or public-figure plaintiffs were
> involved, the *New York Times* rule already required a showing of
> falsity before liability could result. 475 U.S., at 775, 106 S.Ct., at
> 1563.

497 U.S. at 19-20 & n.6. And the Supreme Court has not directly addressed the applicable

standards in private defamation actions since its decision in *Hepps*.

The Court's descriptions of the interplay between state defamation law and the

First Amendment in *Gertz*, *Dun & Bradstreet*, *Hepps*, and *Milkovich* reflect the development

and expansion, through judicial decisions, of limitations on state law defamation claims that

began with *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). Prior to *New York Times*

*Co. v. Sullivan,* there were no limitations imposed by the First Amendment on state law

defamation claims. Following that decision and subsequent decisions extending its reach, the

Court essentially required states to except from their generally applicable defamation rules

claims by public officials and/or public figures for defamation based on statements involving

matters of public concern. Thus, *New York Times v. Sullivan* and its progeny created an

exception to the general rules applicable to defamation claims. *Gertz* itself created a new

exception for private figure defamation claims against media defendants; *Dun & Bradstreet* made it clear there are limits to the *Gertz* exception as both *Hepps* and *Milkovich* acknowledge. Having made clear what issues it was not deciding – *Milkovich*, 497 U.S. at 20 n.6; *Hepps*, 475 U.S. at 779 n.4 – the Court has never held that the First Amendment limits the application of state defamation law to claims by private figures against non-media defendants based on statements that do not involve matters of public concern.

If *Gertz* meant what defendant now says it means, then the dissent in *Dun & Bradstreet* would have prevailed and both footnote 4 of the majority opinion and Justice Brennan's concurrence in *Hepps* would have been entirely unnecessary. Defendants' reliance on *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 694 n.4 (1998), regarding the potential applicability of *Gertz* is misplaced, because the Court's footnote is entirely dictum. Because the plaintiff in *Newcomb* could not satisfy the state law requirements for his defamation claim, there was no occasion for the court to decide whether constitutional concerns affected the applicable standard of care. The court also noted (in the same footnote) that there was a strong argument that the plaintiff, a retired Hall of Fame pitcher for the Dodgers, was a public figure. The entire *Newcombe* footnote was completely unnecessary to its decision. It was also an incorrect distillation of *Gertz* as the discussions of *Hepps* and *Milkovich* above demonstrate.

Finally, defendant's reliance on *Citizens United v. Federal Election Commission*, 130 S.Ct. 876 (2010), does not aid her argument. There, the Court was considering the constitutionality of a legislative ban on independent electioneering communications advocating the election or defeat of a federal candidate by corporations within 30 days before a primary election in light of the First Amendment's proscription that "Congress shall make no law . . . abridging the freedom of speech." The ban was particularly troubling to the Court because it involved political speech at the core of the First Amendment and, if upheld, would permit Congress to ban political speech of media corporations. 130 S.Ct. at 904-05. That Congress had chosen to exempt media corporations in the law was not sufficient

PAGE 14 –  PLAINTIFFS' OPPOSITION TO MOTION FOR NEW TRIAL

to save the law, seemingly because the distinctions between media corporations and non-media corporations in the law were unfair or irrational. *Id.*, 130 S.Ct. at 906.

In that context, the Court did say: "There is no precedent supporting laws that attempt to distinguish between corporations which are deemed to be exempt as media corporations and those which are not." *Id.*, 130 S.Ct. at 905. But the Court's statement does not help defendant here for at least two reasons: (1) this case does not involve a law enacted by Congress that bans core political speech by some but not others, but rather involves the potential application of judicially imposed limitations on state law defamation claims based on statements that do not involve matters of public concern; and (2) as demonstrated above, the Court's apparent historical statement is also incorrect in light of the Court's own precedents and descriptions of the state of the law in *Hepps* and *Milkovich*. The *Citizens United* Court's citation to Justice Scalia's dissent in *Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 691 (1990), a decision that had upheld a state law ban on corporate speech in favor of or opposed to a candidate and which was overruled by *Citizens United*, is puzzling, because the view he expressed there was not accepted by the majority of that Court. Likewise, its citation to the *Dun & Bradstreet* concurrence by Justice White and dissent by Justice Brennan does not support the historical statement, at least as it applied to limitations on state law defamation actions, for the reasons discussed above.

In sum, this court properly distilled the existing state of the law with respect to defamation claims by private figures against non-media defendants and properly concluded that the constitutional limitations announced in *Gertz* were inapplicable here. And, contrary to defendant's assertion, footnote 4 in *Newcombe* does not represent a Ninth Circuit ruling precluding strict liability in a case such as this.

Defendant now seeks to expand or modify the existing law by applying the rules announced in *Gertz* to the circumstances of this case. It is certainly possible both that the U.S. Supreme Court may revisit this topic in the future and decide some of the questions that it has

expressly reserved in the past, and that it may shift from its earlier decisions by applying the same standards to media and non-media defendants in all contexts. But the Court has not yet done so. Nor is it clear or even likely for that matter that, if the Supreme Court were to decide to treat all defamation defendants the same, it would achieve equality by further limiting private figure defamation claims rather than by rolling back the protections it has previously provided to media defendants. Finally, in the event that this court's rulings regarding the standard of proof did not accurately anticipate how the Supreme Court might someday extend the law, any error by this court certainly does not amount to plain error within the meaning of FRCP 51 (discussed in more detail above).

### 2.     Defendant's Statements Did Not Involve Matters of Public Concern.

This court correctly concluded that defendant's statements – her allegations of tax fraud by plaintiffs in response to plaintiff's demand that she stop defaming them – did not involve a matter of public concern.

As this court noted in its November 30, 2011 opinion – "[w]hether ... speech addresses a matter of public concern must be determined by [the expression's] content, form, and context ... as revealed by the whole record" – *Dun & Bradstreet*, 472 U.S. at 761 (quoting *Connick v. Myers,* 461 U.S. 138, 147-48 (1983)). The analysis in *Weeks v. Bayer*, 246 F.3d 1231, 1234-36 (9th Cir. 2001), cited by defendants, is not to the contrary. *Weeks*, like *Connick*, involved a claim for improper retaliation in violation of the First Amendment where a governmental employee claimed he had been fired for making statements critical of his supervisor on a matter of public concern.

While an allegation of fraud in a government program may be an indicia of public concern, the claim that was tried here did not concern any alleged fraud in the operation of a government program. Rather, the defamatory statement at issue in this trial was an assertion of tax fraud related to the liquidation of assets in a bankruptcy. This court's November 30, 2011 opinion carefully analyzed the nature of defendant's defamatory speech

and correctly concluded that it did not involve a matter of public concern because of the limited public interest in the proceedings concerning the bankruptcy and liquidation of a private company.

> Again, while presumably Summit's collapse generated news stories, the content of the statements at issue here concern Padrick's role as a bankruptcy trustee. There is no evidence that any public attention was paid to the Summit bankruptcy proceedings other than the attention defendant gave to the issue. Thus, although defendant made her statements in a forum available to the general public, without more, her statements regarding Padrick's conduct in his role as a bankruptcy trustee in the bankruptcy proceedings of a private corporation, are not statements made on a matter of public concern.

(Opinion, November 30, 2011, at 12). Nothing in defendant's new trial motion effectively challenges this Court's previous analysis.

Defendant's assertion that the absence of an existing controversy is irrelevant to whether the speech is on a matter of public concern is neither logical nor supported by the cases on which defendant relies. In *Gardner v. Martino*, 563 F.3d 981 (9th Cir. 2009), the plaintiffs-appellants had conceded that the statements at issue involved matters of public interest when they did not challenge that the defendants had met their initial burden under ORS 31.150. *Gardner*, 563 F.3d at 986 & n.7 ("Appellants do not challenge that the Appellees met their initial burden to show that Martino's statements fall within one of the categories of civil actions described in Or.Rev.Stat. § 31.150(2)", which applies "[i]n pertinent part to '(c) Any oral statement made, or written statement or other document presented, in a place open to the public or a public forum in connection with an issue of public interest; or (d) Any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.'" (Emphasis added)).

The defendants, the broadcaster who aired the radio show at issue and the host of the show, were media defendants who properly brought an anti-SLAPP motion to strike

under ORS 31.150.  The court first concluded that the statements at issue were not actionable because they were an interpretation of disclosed facts.  *Gardner*, 563 F.3d at 988-89.  The court then concluded that, even if the disclosed facts were false, plaintiff would have to establish negligence under *Gertz* and could not do so.  *Id.* at 989.  In light of the concession regarding the public interest and the presence of media defendants, the application of *Gertz* is unremarkable and irrelevant to the present case.

The decision in *Straw v. Revel*, 813 F.2d 356 (11th Cir. 1987),[5] includes no analysis of the issue regarding whether the defamatory statements involved a matter of public concern; the court merely concludes that it did.  And nothing in the opinion suggests or stands for the proposition that the absence of an existing controversy is irrelevant to the analysis.  While the inquiry into whether a statement involves a matter of public concern is distinct from the inquiry into whether a plaintiff is a public figure, the absence of a pre-existing controversy is relevant to both determinations.  As to the latter, *Hutchinson v. Proxmire* makes clear that "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." 443 U.S. at 135.  As to the public concern determination, the absence or presence of an existing public controversy is directly relevant to assessing the context of the statements at issue.   And defendant's unsupported assertion to the contrary is unpersuasive and illogical.

Moreover, the evidence presented at trial demonstrates that defendant in fact was pursuing her own private interest in seeking compensation from plaintiffs to protect them from her and her defamatory postings.  Her defamatory statements were simply part and parcel of her private agenda to ratchet up the pain on plaintiffs to coerce or extort them into paying her for her online reputation management services.  In these circumstances, the fact that she

---

[5]    Defendant's reliance on *Straw* is curious for another reason.  There, the Eleventh Circuit expressly recognized that there are categories of defamation claims and defamation defendants for which the First Amendment imposes no limits on state law.  813 F.2d at 362.

PAGE 18 –  PLAINTIFFS' OPPOSITION TO MOTION FOR NEW TRIAL

posted her assertions on the internet does not convert them into speech on a matter of public concern.

### 3.   Neither Padrick nor Obsidian is a Public Official

Defendant's argument that plaintiffs are public officials for purposes of *New York Times v. Sullivan* was properly considered and rejected by the court in its November 30, 2011 opinion. As this court noted, *Gertz* effectively forecloses the argument that plaintiffs are public officials. Neither Padrick nor Obsidian is a governmental official or employee. Neither was elected or appointed to a government position. Padrick is an attorney who served as a bankruptcy trustee; he did not supplant the United States Trustee, who continued to participate in the Summit Accommodators bankruptcy. Padrick was not paid with public funds; rather, as a bankruptcy trustee, his fees and the fees of his attorneys were paid from the assets of the estate of a private company.

That the bankruptcy court oversaw the collection of assets and distribution to creditors by Padrick as bankruptcy trustee does not transform plaintiffs into public officials for purposes of defamation law. While bankruptcy trustees have duties specific to their roles, so do all other attorneys who act under direction from the courts. If supervision by or assistance to the court in fulfilling a judicial function were sufficient to transform a bankruptcy trustee into a public official for purposes of defamation law, every attorney who issued a subpoena as an officer of the court, accepted an appointment as court-appointed counsel, or who brought an action to obtain the court's assistance in seeking redress for a client would effectively become a public official under defendant's public official argument.

The Texas and Idaho defamation cases relied on by defendant do not help her cause. In *HBO v. Harrison*, 983 S.W.2d 31 (Tex. App. 1998), the Texas court found that the plaintiff, a court-appointed psychologist in a custody dispute, was a public official for purposes of defamation law because the court that had made the appointment had also delegated to the psychologist the power to determine the visitation rights at issue. While the Texas court's

reasoning and conclusion are unpersuasive, the situation is distinguishable from the case of an appointed bankruptcy trustee, whose work is subject to oversight by the U.S. Trustee and oversight and approval by the Bankruptcy Court.

And in *Bandelin v. Pietsch*, 98 Idaho 337, 340, 563 P.2d 395, 398 (1977), the Idaho Supreme Court concluded that the defamation plaintiff was a public figure, not that he was a public official by virtue of his appointment as guardian of an estate. The Idaho court's public figure holding was based both on the plaintiff's general prominence in the community and on his involvement in the controversy regarding the administration of the estate at issue. As to the former, the court noted:

> A review of the record reveals that Bandelin was prominent in the local politics of Bonner County, had been a representative in the state legislature, was a leading attorney, and was well-known throughout the county. Counsel for Bandelin argues, however, that in recent years Bandelin's public role has subsided-that he has reverted to the 'simple small-town lawyer he was before he gained notoriety.' We concede that a public figure can revert back to the 'lawful and unexciting life lead by the great bulk of the community.' Prosser, Law of Torts, s 107 (1st ed. 1941). But it is far more common that a public figure will retain residual elements of his former status even when he returns to private life.

With respect to the plaintiff's involvement as guardian of the estate at issue, the Idaho court concluded that he was the pivotal figure in the controversy at issue. To the extent that the court's holding was dependent on his role in the controversy created by the newspaper's reporting concerning the administration of the estate in question, that portion of the court's analysis is now foreclosed by the United States Supreme Court's decision in *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979), two years after *Bandelin*. As this court properly noted in the November 30, 2011 opinion, public figure status must pre-exist the defamatory publication and cannot be created by the publication itself. (Opinion, November 30, 2011, at 7-8); *Hutchinson v. Proxmire*, 443 U.S. at 135 ("Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.")

PAGE 20 – PLAINTIFFS' OPPOSITION TO MOTION FOR NEW TRIAL

*Gertz* rejected similar arguments, as did this court in its November 30, 2011 opinion. There is no reason to revisit that decision. This court got it right the first time.

## IV.   THE COURT SHOULD NOT DISTURB THE JURY'S DAMAGES AWARD

A court may grant a motion for new trial based upon an allegedly excessive damages award only if the award is "grossly excessive or monstrous, clearly not supported by the evidence, or only based on speculation or guesswork." *Snyder v. Freight Const, Local No. 287*, 175 F.3d 680, 689 (9th Cir.), *cert. denied*, 528 U.S. 926 (1999). A trial court reviewing a damages award attacked as excessive must consider the evidence in the light most favorable to the prevailing party. *Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1387 (9th Cir. 1987), *amended on other grounds*, 817 F.2d 609 (9th Cir. 1987). If the court concludes that the damages award is excessive, it may grant the motion for new trial or, alternatively, deny the motion conditioned upon the plaintiff agreeing to accept a damages award in the maximum amount sustainable by the proof. *D&S Redi-Mix v. Sierra Redi-Mix & Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982).

The damage award to each of the plaintiffs was well within the range of reasonable given the evidence presented to the jury at trial. The jury heard the following testimony at the trial:

- The false posting accused the plaintiffs of criminal conduct in connection with a professional engagement involving a bankruptcy case (Trial Ex. 1A)
- The posting went up on December 25, 2010, went "viral" on the internet, still existed on multiple sites as of the day of trial almost one year later and would be there forever given the nature of the internet and Cox's refusal to take the posting down or acknowledge that it was false (11/29/11 Tr., 88:21 – 89:4, 89:15-17, 165:20 – 167:14, 165:20 – 167:14)

- Cox took technological steps to ensure that the posting went to the top of any search engine search concerning Padrick or Obsidian, so that it would be read by anyone doing an internet search of them (*Id.*, 177:9 – 178:20)

- Given the nature of plaintiffs' business and client/partner profile, plaintiffs' reputation is critical and it would be expected that potential clients and business partners would use the internet as a search tool and see Cox's defamatory posting (*Id.*, 76:8 – 77:23, 125:14 – 126:8, 127:14 – 128:18, 130:2-12, 146:21 – 147:17)

- Numerous clients and potential business partners had read the blog posting and raised serious concerns with Padrick and Obsidian, and in some instances decided to delay business deals or not proceed with them at all (*Id.,* 87:19 – 88:9, 92:22 – 93:12, 161:3 – 163:16)

- A typical advisory engagement for Obsidian generates between $100,000 to $5 million or more (*Id.*, 88:13-16)

- Since the posting went up, Obsidian's advisory work has dropped off to almost nothing, as Obsidian has only one new advisory engagement during a time when they would expect to see substantial advisory engagement work (*Id.,* 88:17-20, 92:16-21)

- Obsidian's advisory business work was down $1 million in just one year alone since the posting went up (2011), which does not take into account that the posting will continue to damage plaintiffs' reputations indefinitely (*Id.*, 107:4-14)

This evidence easily supports the damages award that the jury gave to each of the plaintiffs. *See, e.g., Osorio v.* Source *Enterprises, Inc.*, 2007 WL 683985, *10 (SDNY) (upholding $3.5 million damages award in defamation case, noting that it was "within the

reasonable range for a case involving a defamatory statement that harms an individual's reputation" and "branded [plaintiff] as a criminal in the industry").

Defendant's argument for a new trial on damages is based on an unwarranted assumption. Defendant assumes that the jury intended its damages award to be reasonable compensation for the damage caused by <u>all</u> of the postings made by Cox, including those that the Court earlier removed from the case on summary judgment over plaintiffs' opposition. (Def. Memo. at 22-23).

There is no basis for making such an assumption. Consistent with the court's ruling, the only posting admitted into evidence was Exhibit 1A. The evidence and argument at trial focused on that posting. Plaintiffs substantially reduced their damages request—from $10 million to $1 million—in light of the court's summary judgment ruling. If the court had allowed plaintiffs to go to trial on all of the postings, plaintiffs would have substantially increased their damages request. Under the circumstances, there is no basis to assume that the jury intended to award damages related to any postings that were not in evidence and not at issue in the trial.

## V.    THE COURT CORRECTLY RULED THAT THE MEDIA SHIELD LAW DOES NOT APPLY IN THIS CASE

*Amicus curaie* EFF argues that Oregon's Media Shield Law, ORS 44.510 *et seq.*, was essentially irrelevant in this case because Cox openly disclosed the claimed source of the information for her defamatory posting. (EFF Memo. at 8). Plaintiffs agree. We understand that the court made a substantive ruling on the applicability of the law in its November 30 opinion only because Cox continued to raise the law as a "defense" up to the day of trial (despite having already revealed her source).

The court's substantive ruling on Oregon's Media Shield Law was correct. Oregon's shield law does not apply "with respect to the content or source of allegedly defamatory information, in civil action for defamation wherein the defendant asserts a defense

based on the content or source of such information." ORS 44.530(3). That is precisely what we have here—a civil action for defamation where the defendant purported to assert in one form or another defenses based on the source or content of the statements posted on the internet. The shield law therefore does not apply.

Moreover, the court correctly concluded that Cox is not a media person entitled to protection under the statute. Although defendant claims to be a journalist and investigative blogger, she is not affiliated with "any newspaper, magazine or other periodical, book, pamphlet, news service, wire service, news or feature syndicate, broadcast station or network, or cable television system." ORS 44.510(2). The shield law therefore does not apply to her, but even if it did, it would not apply here because of the exception for defamation actions. ORS 44.530(3).

## VI.   THE COURT CORRECTLY CONCLUDED THAT OREGON'S RETRACTION STATUTE DOES NOT APPLY HERE

*Amicus curaie* EFF also argues that the Oregon retraction statute applied in this case. EFF is wrong. Oregon's retraction statute does not apply to blog postings on the internet. ORS 31.210 provides:

> (1) In an action for damages on account of a defamatory statement published or broadcast in a newspaper, magazine, other printed periodical, or by radio, television or motion pictures, the plaintiff shall not recover general damages unless:
>
> (a) A correction or retraction is demanded but not published as provided in ORS 31.215; or
>
> (b) The plaintiff proves by a preponderance of the evidence that the defendant actually intended to defame the plaintiff.
>
> (2) Where the plaintiff is entitled to recover general damages, the publication of a correction or retraction may be considered in mitigation of damages.

The Oregon retraction statute only applies to defamatory statements "published or broadcast in a newspaper, magazine, or other printed periodical, or by radio, television or motion pictures." ORS 31.210. Defendant's internet blog is not a newspaper, magazine or other printed periodical. Nor is her internet blog a radio, television or motion picture. The statute is simply inapplicable to defendant's internet blog. The special protections for newspapers, magazines, other printed periodicals, radio and televisions broadcasting stations, and motion picture theaters date to 1955, long before the internet existed. In the 56 years since then, the Oregon legislature has not expanded the coverage of the retraction statute to internet bloggers like defendant. Unless and until it does so, internet bloggers like defendant cannot rely on the retraction statute to limit the damages of plaintiffs who have not followed the statutory procedures for seeking retractions from those entities that are subject to it.

EFF essentially argues that the statute *should* apply to internet blog postings. (EFF Memo. at 7). But that is a policy decision to be made by Oregon's legislature. It is not a basis to extend the statute here.

Moreover, to the extent that the court was otherwise inclined to extend the reach of the statute, plaintiffs complied with the statute's requirement for a demand of a retraction. Plaintiffs sent defendant a cease and desist letter that specifically requested plaintiff to take down any accusations of criminal tax fraud. Defendant acknowledged receiving the demand and responded by making another posting with the same allegation, and never removed it. Thus, even if the court concluded that the retraction statute should be extended to blog postings, plaintiffs complied with the statute here.

PAGE 25 – PLAINTIFFS' OPPOSITION TO MOTION FOR NEW TRIAL

## VII.    CONCLUSION

For all of the reasons above, the court should to exercise its considerable discretion to deny defendant's motion for a new trial.

DATED this 30th day of January 2012.

TONKON TORP LLP

By:/s/ Steven M. Wilker
    Steven M. Wilker, OSB No. 911882
      Direct Dial:  503.802.2040
      Fax:  503.972.3740
      E-Mail:  steven.wilker@tonkon.com
    David S. Aman, OSB No. 962106
      Direct Dial:  503.802.2053
      Fax:  503.972.3753
      E-Mail:  david.aman@tonkon.com
    Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR NEW TRIAL** on:

> Benjamin N. Souede
> Angeli Law Group LLC
> 121 SW Morrison Street
> Suite 400
> Portland, OR 97204
> Benjamin@angelilaw.com
>
> Richard D. McLeod
> Klarquist Sparkman, LLP
> 121 SW Salmon St., Ste 1600
> Portland, OR 97204
> Richard.mcleod@klarquist.com
>
> Matthew J. Zimmerman
> Electronic Frontier Foundation
> 454 Shotwell St.
> San Francisco, CA 94110
> mattz@eff.org

By electronic means through the Court's Case Management/Electronic Case File system on the date set forth below;

DATED this 30th day of January 2012.

TONKON TORP LLP

By /s/ Steven M. Wilker
   Steven M. Wilker, OSB No. 911882
    Direct Dial:  503.802.2040
    Fax:  503.972.3740
    E-Mail:  steven.wilker@tonkon.com
   David S. Aman, OSB No. 962106
    Direct Dial:  503.802.2053
    Fax:  503.972.3753
    E-Mail:  david.aman@tonkon.com
   Attorneys for Plaintiffs

033992/00010/3342551v1

PAGE 1 - CERTIFICATE OF SERVICE