IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

OBSIDIAN FINANCE GROUP, LLC, and
KEVIN D. PADRICK,                                           No. 3:11-cv-57-HZ

          Plaintiffs,

      v.                                                             OPINION & ORDER

CRYSTAL COX,

          Defendant.

Steven M. Wilker
David S. Aman
TONKON TORP LLP
1600 Pioneer Tower
888 S.W. Fifth Avenue
Portland, Oregon 97204

      Attorneys for Plaintiffs

Benjamin N. Souede
ANGELI LAW GROUP, LLC
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204

1 - OPINION & ORDER

Eugene Volokh
MAYER BROWN, LLP
UCLA School of Law
405 Hilgard Avenue
Los Angeles, California 90095

     Attorneys for Defendant

Richard D. McLeod
KLARQUIST SPARKMAN, LLP
121 S.W. Salmon Street, Suite 1600
Portland, Oregon 97204

Matthew J. Zimmerman
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street
San Francisco, California 94110

     Attorneys for *Amicus Curiae* Electronic Frontier Foundation

HERNANDEZ, District Judge:

     After a one-day trial on November 29, 2011, the jury awarded $2.5 million in damages to

plaintiffs Obsidian Finance Group, LLC and Kevin Padrick[1] on plaintiffs' defamation claim

brought against defendant Crystal Cox.[2]  Judgment was filed on December 8, 2011.

     Defendant moves for a new trial, arguing that the jury instructions misstated the law and

that the jury verdict is excessive.  I deny the motion.

BACKGROUND

     As the previous Opinions in this case explain, the defamation claim brought by plaintiffs

---

[1]  The jury awarded $1 million to Obsidian Finance and $1.5 million to Padrick.

[2]  Defendant represented herself throughout the case, through the entry of Judgment.  Her recent representation by counsel is limited to post-trial motions to set aside the verdict and motions requesting a new trial.  See Dkt #100 (Notice of Appearance filed December 30, 2011). Defendant continues to represent herself on all other issues.

concerned blog posts made by defendant about plaintiffs.  As a result of summary judgment

rulings, one particular blog post, dated December 25, 2010 and posted on

bankruptcycorruption.com, remained at issue for trial.  In a September 9, 2011 Jury Trial

Management Order, I required the parties to file, one week before trial, various pretrial

documents, including trial memoranda and proposed jury instructions.  Dkt #39.  That Order also

indicated that motions in limine and objections to witnesses and exhibits were to be presented

orally the morning of trial.  Id.

      As a result of discovery issues, plaintiffs were scheduled to take defendant's deposition at

the courthouse the day before trial.  Dkt #57.  Argument on a motion to compel filed by plaintiffs

was set for the same date.  Dkt #68.  On November 16, 2011, I denied a motion to compel by

defendant which raised several legal issues.  Dkt #70.  Among other rulings, I  specifically

instructed defendant that she could raise her legal arguments "regarding her status as 'media,'

application of retraction statutes, privilege, actual malice, and Padrick's status as a public figure,"

in her "trial memorandum, due on November 22, 2011."  Id.

      On November 21, 2011, defendant filed a trial memorandum, an exhibit list, and a

proposed verdict form.  Dkt #s 81, 82, 83.  She filed no jury instructions.  On November 28,

2011, defendant filed written objections to plaintiffs' witnesses and written objections to

plaintiffs' exhibits, despite the Jury Trial Management Order's express directive that these were to

be presented orally the morning of trial.  Dkt #s 85, 86.

      Also on November 28, 2011, the previously scheduled argument on plaintiffs' pending

motion to compel occurred.  Having reviewed the pretrial documents submitted by both parties, I

orally ruled on several of the legal issues defendant raised in her trial memorandum.  The Minute

Order from that hearing states, in pertinent part, that

> [t]he court denies the following defenses as stated in defendant's Trial Memorandum: Defenses under (1) the Oregon retraction statute; (2) Anti-Slapp law; (3) actual malice; and, (4) absolute privilege. The court determines that the plaintiffs are not public figures, that defendant is not the media, and that the shield law doesn[']t apply. Additionally, the court determines that the subject matter of the blog post at issue is not a matter of public concern. An opinion explaining the court[']s reasoning on these issues will follow.

Dkt #89.

On November 30, 2011, the day after trial, I filed the written opinion explaining my oral rulings on the legal issues. Dkt #95. The new trial motion attacks many of those rulings, as well as the amount of the verdict awarded by the jury.

## STANDARDS

The court may grant a new trial "on all or some of the issues-and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A).

> Historically recognized grounds include, but are not limited to, claims that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving. We have held that the trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice.

Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007) (citation and internal quotation marks omitted). Erroneous jury instructions, as well as the failure to give adequate instructions, may be the basis for a new trial under Rule 59(a). Murphy v. City of Long Beach, 914 F.2d 183, 187 (9th Cir. 1990). The trial court has discretion in deciding whether to grant a new trial. Freund v. Nycomed Amersham, 347 F.3d 752, 764 n.13 (9th Cir. 2003).

4 - OPINION & ORDER

DISCUSSION

I.  Jury Instructions

A.  Standards for Evaluating Alleged Error

Under Federal Rule of Civil Procedure 51, a party may assign as error an instruction actually given, or may assign as error the failure to give a properly requested instruction, if the party has properly objected.  Fed. R. Civ. P. 51(d)(1).  "A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection."  Fed. R. Civ. P. 51(c)(1).  When the court, before instructions and arguments are delivered to the jury, gives the parties the opportunity to object to an instruction, or to the failure to give an instruction, on the record and out of the presence of the jury, a party must make its objection at that time for the objection to be timely.  Fed. R. Civ. P. 51(c)(2)(B)  (referring to time provided in Rule 51(b)(2)).  Otherwise, the "court may consider a plain error in the instructions that has not been preserved as required by Rule 51(d)(1) if the error affects substantial rights."  Fed. R. Civ. P. 51(d)(2).

Defendant failed to submit any proposed jury instructions, failed to expressly object to any of the instructions that were given, and failed to expressly object to the failure to give an instruction, despite being given the opportunity to do so in conformance with Rule 51(b).  Dkt #102 (Trial Tr. at pp.182-83, 184).  Defendant argues that the legal arguments presented in her trial memorandum sufficiently articulated her position on the law and that further argument about the jury instructions would have been futile, excusing her failure to expressly object.

I reject this argument.  Although the Ninth Circuit recognizes a limited exception to the objection requirements of Rule 51 "where the district court is aware of a party's concerns and

further objection would be unavailing[,]" the court has made clear that "the exception is available when (1) throughout the trial the party argued the disputed matter with the court, (2) it is clear from the record that the court knew the party's grounds for disagreement with the instruction, and (3) the party offered an alternative instruction." Medtronic, Inc. v. White, 526 F.3d 487, 495 (9th Cir. 2008) (citation, internal quotation marks, and brackets omitted).

Here, defendant raised the issues in her trial memorandum, but did not raise them again. During trial, she sought no reconsideration of the oral rulings on the legal issues made the previous day. Importantly, defendant offered no alternative instruction, despite being on notice for more than two months before trial that she had the opportunity to submit proposed instructions, despite a familiarity with the court's filing system, and despite filing other documents without leave of court. Although defendant was representing herself, "[p]ro se litigants must follow the same rules of procedure that govern other litigants." King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987). Defendant's pro se status does not excuse her duty to comply with procedural rules.

"Plain error review requires: (1) an error; (2) that the error be plain or obvious; (3) that the error have been prejudicial or affect substantial rights; and (4) that review be necessary to prevent a miscarriage of justice." Settlegoode v. Portland Pub. Schs., 371 F.3d 503, 517 (9th Cir. 2004) (discussing plain error review when no contemporaneous objection made to alleged attorney misconduct during the trial); see also Sherman v. Kasotakis, 314 F. Supp. 2d 843, 859-60 (N.D. Iowa 2004) (in context of analyzing argument made in motion for new trial regarding erroneous jury instructions, court explained that "[p]lain error is present 'only if the error prejudices the substantial rights of a party and would result in a miscarriage of justice if left

uncorrected.'") (quoting Rush v. Smith, 56 F.3d 918, 922 (8th Cir. 1995)).

 B.  Discussion

 Defendant ably raised several relevant legal issues in her trial memorandum.  She repeatedly referred to herself as media which she contended insulated her from defamation lawsuits.  Dkt #81  (Def.'s Tr. Mem.) at pp. 1-2.  She alleged that the issues of the blog post were of public interest and that plaintiffs were public figures.  Id. at p. 2 (e.g., "Defendant is media and . . . the issue of this blog post is of public interest, and is about a Public Figure, and is on a public forum."); see also id. at p. 5 (arguing that plaintiffs were public figures).  She claimed protection under the First Amendment.  Id. at p. 6.  She also argued that there was no proof of actual malice and thus, she was immune from liability.  Id. at p. 4.  She expressly cited New York Times Co. v. Sullivan, 376 U.S. 254 (1964).  Id. at p. 5.

 Although defendant sufficiently raised these issues in her trial memorandum, as with most pro se litigants, defendant's arguments required some interpretation and clarification.  Thus, while the argument that she was "media" appeared to be most directly related to her position that certain state statutes immunized her from liability, her reliance on the First Amendment suggested that the "media" argument also pertained to the standard of liability required on the defamation claim.  In an effort to comprehensively address her arguments, I construed them to raise as many First Amendment issues as I could identify based on her trial memorandum.  Additionally, plaintiffs' trial memorandum squarely raised these issues in the context of determining the appropriate standard of liability.

 The jury was instructed, inter alia, that

   [t]he plaintiffs claim that the defendant defamed them.  This requires the

plaintiffs to prove it is more likely true than not that:

1. The defendant communicated a fact about the plaintiffs;
2. What the defendant communicated was false and defamatory;
3. The defendant published the communication to a third person;
4. The third person reasonably understood both that the communication was about the plaintiffs and had a defamatory meaning; and
5. The defendant's communication damaged the plaintiffs.

Dkt #92 at p. 10. The jury was also instructed that "[d]efendant's knowledge of whether the statements at issue were true or false, and defendant's intent or purpose in publishing those statements, are not elements of the claim and are not relevant to a determination of liability." Id. at p. 11. I gave these particular instructions because I rejected defendant's arguments that she was "media," that plaintiffs were public figures, and that the blog post referred to a matter of public concern, and thus, that a higher standard of fault was required.

In her motion for new trial, defendant argues that the jury instructions as given were plainly erroneous because (1) Padrick is a "special purpose" public official, Obsidian Finance is a public figure, and therefore, the "actual malice" standard in New York Times is the appropriate standard of liability; (2) even if plaintiffs were private figures, the blog post addressed a matter of public concern, requiring the "actual malice" standard for an award of presumed damages; and (3) even if plaintiffs were private figures and the matter was one of private concern, a negligence standard of liability is required by Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974).[3] For the reasons explained below, I reject defendant's arguments.

1. Public Official, Public Figure, Matter of Public Concern

These issues do not require lengthy discussion as I rely on the reasoning in my November

---

[3] *Amicus* raises additional challenges to my determinations regarding Oregon's retraction and media "shield law" statutes. I address those below.

20, 2011 Opinion and none of the arguments presented in the new trial motion mandates a different conclusion.  I note, however, that as I understood defendant's position at trial, it was never that plaintiffs were public officials; rather defendant argued that plaintiffs were limited purpose public figures.   Thus, I have not previously addressed the "public official" argument made in the new trial motion.

The argument is unpersuasive.  Status as an officer of the court does not transform Padrick into a public official.  See Gertz, 418 U.S. at 351 (rejecting argument that the plaintiff was a "de facto public official" by appearing at a coroner's inquest and indicating that such an argument "would sweep all lawyers under the New York Times rule as officers of the court and distort the plain meaning of the 'public official' category beyond all recognition"; noting further that the plaintiff had never held any "remunerative governmental position").

Neither Padrick nor Obsidian Finance were government employees.  Neither was elected or appointed to a government position.  In contrast to the United States Trustee who is appointed by the United States Attorney General, the private bankruptcy trustee in a Chapter 7 or 11 proceeding is compensated from the "moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims."  11 U.S.C. § 326(a); see also 28 U.S.C. §  581(18) (providing that the Attorney General appoints a United States Trustee for various judicial districts, including the District of Oregon); 28 U.S.C. § 587 (salaries of United States Trustees are fixed by the Attorney General at the rate of basic compensation provided for Executive Level IV of the Executive Schedule set forth in 5 U.S.C. § 5315); Stanley v. Gonzales, 476 F.3d 653, 655 (9th Cir. 2007) (noting that United States trustees are appointed by the Attorney General to oversee the administration of bankruptcy cases and

private trustees).  Padrick and Obsidian were not public officials.

Defendant further suggests that the matter of a bankruptcy trustee committing tax fraud is a matter of public concern because exposing criminal fraud is always in the public interest.  The cases defendant cites are distinguishable.  For example, in Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767 (1986), the statements at issue were not just that the private figure plaintiff was connected to organized crime, but that the plaintiff had used the connection to influence the state's legislative and administrative governmental processes.  Id. at 769.  The case does not stand for the proposition that a statement regarding a private figure plaintiff's connection to organized crime alone is a matter of public concern in a defamation claim.

Similarly, in Boule v. Hutton, 328 F.3d 84 (2d Cir. 2003), and Silvester v. ABC, Inc., 839 F.2d 1491 (11th Cir. 1988), the statements at issue addressed fraud or corruption in an industry, or in the context of a national or international market.  Boule, 328 F.3d at 91 (discussing in the context of a Lanham Act false advertising claim that the statements at issue concerned fraud in the art market); Silvester, 839 F.2d at 1493 (noting that the public has a legitimate interest in "all matters of corruption," particularly when it involved gambling in a highly regulated industry and the effects of the corruption could cost taxpayers millions of dollars).  Here, defendant's December 25, 2010 blog post, which was the basis of the defamation claim considered by the jury, did not mention plaintiffs in the context of reporting fraud or misconduct on a national scale or with bankruptcy trustees generally.  It did not accuse Padrick of engaging in such conduct repeatedly or while acting as a bankruptcy trustee in other cases, or in any other context.  Rather, the allegations in the actionable post related to a single instance of alleged tax fraud by failing to pay taxes on all of the alleged taxable gain allegedly realized by the bankruptcy estate.

10 - OPINION & ORDER

While defendant cites to <u>Brueggemeyer v. Krut</u>, 684 F. Supp. 471 (N.D. Tex. 1988), for the proposition that accusations of financial fraud by a bulk meat operator related to a matter of public concern, a closer reading of that case shows that defendant has misstated the context of the court's statement. <u>Krut</u> was a companion case to <u>Brueggemeyer v. ABC, Inc.</u>, 684 F. Supp. 452 (N.D. Tex. 1988). Both cases concerned a broadcast by defendant ABC on its "20/20" news program regarding the plaintiff's business practices.

In <u>ABC</u>, the court first confronted the question of whether the plaintiff was a limited purpose public figure. The first part of the three-part test the court used to resolve that question required the court to determine whether the controversy at issue was "public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution[.]" <u>ABC</u>, 684 F. Supp. at 455. The court noted that the summary judgment record showed that before the broadcast giving rise to the plaintiff's claims, there was a public controversy regarding the bulk meat and freezer beef retail industry in general and the plaintiff in particular. <u>Id.</u> at 456. Accordingly, it found that people were discussing the issue and people other than the participants in the controversy were likely to feel the impact of its resolution. <u>Id.</u> After discussing the other two elements of the limited public figure test, the court concluded that the plaintiff was a limited purpose public figure. <u>Id.</u> at 456-58.

In the <u>Krut</u> case, cited by defendant here, Brueggemeyer sued a private figure, non-media defendant for the statements made in the 20/20 broadcast. The <u>Krut</u> court noted that it had already determined, in the <u>ABC</u> case, that the plaintiff was a limited purpose public figure. The plaintiff argued that the "actual malice" standard which applied in the <u>ABC</u> case did not apply in

Krut because Krut was not a media defendant. In rejecting this argument, the Krut court stated

that "because the court has already concluded in [ABC] that the 20/20 broadcast was germane to

a public controversy, 684 F. Supp. at 458–59, Krut is entitled to the same First Amendment

protections as are the media defendants." Krut, 684 F. Supp. at 473 n.3. But, as explained

above, the issue in the ABC case was whether the plaintiff was a limited public figure. It was

only within that context that the ABC court examined the public nature of the controversy. And,

as ABC explained, the record on summary judgment showed that the industry in general had

been the subject of public controversy for some time before the 20/20 broadcast. Thus,

defendant's citation to Krut for the proposition that a single allegation of financial fraud by a bulk

meat operator relates to a matter of public concern, overstates the holding of Krut and the ABC

case Krut relied on.

Defendant further cites to Weeks v. Boyer, 246 F.3d 1231 (9th Cir. 2001), for the

proposition that an allegation of fraud within a government program is an "indicia of public

concern." In Weeks, the Ninth Circuit, in the context of a First Amendment retaliation claim by

a discharged public employee, described, in the first paragraph of its opinion introducing the

case, the issue presented as follows: "we must determine whether [the plaintiff's] single

comment regarding the funding status of a government program, made in private and without

further indicia of public concern-such as allegations of mismanagement or fraud, for instance, . . .

carries protected status. We conclude that it does not." Id. at 1233. The quoted statement, relied

on by defendant, is a general concept noted by the court, divorced from any facts, and as such is

not readily disputable, but also is not capable of carrying much precedential value. Importantly,

the statements in the instant case do not concern an allegation of fraud "within a government

program," but an allegation that a private bankruptcy trustee failed to report all taxable income related to the bankruptcy estate of a private corporation.

Defendant's argument requires characterizing any statement regarding a private individual's or a private corporation's alleged willful failure to properly report its taxable income as a statement related to a matter of public concern suitable for enhanced First Amendment protection in the context of a defamation claim. While every taxpayer could certainly be affected by another's failure to pay taxes, I do not read the "matter of public concern" cases to encompass such essentially private conduct. Without more, and for the reasons previously explained in my November 30, 2011 Opinion, my conclusion that defendant's statements regarding plaintiffs' alleged tax fraud were not statements regarding a matter of public concern, was not plain error.

      2. "Media" Defendant

It is important to note that defendant's argument at the time of trial, as plaintiffs and I understood it, was that because defendant was "media," she was entitled to certain First Amendment protections, including requiring plaintiffs to establish liability by proving that defendant acted with some degree of fault, whether it be negligence or "actual malice." Accepting defendant's argument at face value, I understood it to contain two elements: (1) that she is "media," and (2) that her status as "media" alone triggered a fault element in the defamation claim. Because I found the First Amendment cases on the fault issue to be a bit "murky," I resolved her argument by addressing only the first element and concluding that on the record before me, defendant failed to show she was "media" because she cited no relevant case law and because she did not possess any characteristics traditionally associated with the media. Nov. 30, 2011 Op. at p. 9. In my discussion, I did not state that a person who "blogs" could

13 - OPINION & ORDER

never be considered "media." I also did not state that to be considered "media," one had to possess all or most of the characteristics I recited. Rather, I confined my conclusion to the record defendant created in this case and noted that defendant had presented no evidence as to any single one of the characteristics which would tend to establish oneself as a member of the "media." In addition, the uncontroverted evidence at trial was that after receiving a demand to stop posting what plaintiffs believed to be false and defamatory material on several websites, including allegations that Padrick had committed tax fraud, defendant offered "PR," "search engine management," and online reputation repair services to Obsidian Finance, for a price of $2,500 per month. Ex. 33. The suggestion was that defendant offered to repair the very damage she caused for a small but tasteful monthly fee. This feature, along with the absence of other media features, led me to conclude that defendant was not media.

It is also important to note that in the new trial motion, defendant raises an entirely different argument. Instead of arguing that her status as "media" inserts a fault component into the defamation claim, she contends that there is no special First Amendment protection for "media" defendants and that all defamation claims, even those between a private plaintiff and a private defendant on a matter of private concern, require at least negligence by the defendant. This argument was not raised and therefore not addressed at trial. In addition, while the Supreme Court may one day expressly reach the conclusion urged by defendant in this motion, I do not believe it has done so and thus, the jury instructions in this case did not erroneously state the law.

I start with Gertz. There is no question that the defendant in that case, the publisher of a magazine, was a media defendant. The defendant argued that the actual malice standard from New York Times applied to the defamation claim because the plaintiff was a public official or

14 - OPINION & ORDER

public figure and the issue was one of public concern.  418 U.S. at 327.  The Court rejected the

defendant's characterization of the plaintiff as a public official or public figure and described the

principal issue as whether a "newspaper or broadcaster that publishes defamatory falsehoods

about an individual who is neither a public official nor a public figure may claim a constitutional

privilege against liability for the injury inflicted by those statements."  Id. at 332.

On the question of liability, the Court held that the New York Times actual malice

standard did not apply to private plaintiffs.  Id. at 345-48.  However, it made clear that liability

without fault was no longer acceptable in such cases:  "so long as they do not impose liability

without fault, the States may define for themselves the appropriate standard of liability for a

publisher or broadcaster or defamatory falsehood injurious to a private individual."  Id. at 347.

The Court also held that as to damages, a private plaintiff must satisfy the New York Times

actual malice standard to recover presumed or punitive damages.  Id. at 349-50.

In deciding Gertz, the Court did not expressly state that its holding applied only in cases

with a media defendant.  It did, however, repeatedly refer to "publishers," "broadcasters," and the

"media" in its discussion of the respective interests held by these entities on the one hand and by

private individuals on the other hand.  E.g., id. at 340 ("Our decisions recognize that a rule of

strict liability that compels a publisher or broadcaster to guarantee the accuracy of his factual

assertions may lead to intolerable self-censorship.  Allowing the media to avoid liability only by

providing the truth of all injurious statements does not accord adequate protection to First

Amendment liberties.") id. at 341 ("The need to avoid self-censorship by the news media is,

however, not the only societal value at issue."); id. ("Yet absolute protection for the

communications media requires a total sacrifice of the competing value served by the law of

defamation."); id. at 342 ("Some tension necessarily exists between the need for a vigorous and

uninhibited press and the legitimate interest in redressing wrongful injury."); id. ("The New York

Times standard . . . administers an extremely powerful antidote to the inducement to media self-

censorship of the common-law rule of strict liability for libel and slander."); id. at 343 ("the

Court has concluded that the protection of the New York Times privilege should be available to

publishers and broadcasters of defamatory falsehood concerning public officials and public

figures"); id. at 346 (referring to a "publisher or broadcaster of a defamatory error") id. at 347-48

("so long as they do not impose liability without fault, the States may define for themselves the

appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious

to a private individual.  This approach provides a more equitable boundary between the

competing concerns involved here.  It recognizes the strength of the legitimate state interest in

compensating private individuals for wrongful injury to reputation, yet shields the press and

broadcast media from the rigors of strict liability for defamation"); id. at 347 n.10 (noting that

Justice White had previously joined four other justices in Curtis Publishing Co. v. Butts, 388

U.S. 130 (1967) to "extend the knowing-or-reckless-falsity standard to media defamation of

persons identified as public figures but not connected with the Government"); id. at 348 ("Our

inquiry would involve considerations somewhat different from those discussed above if a State

purported to condition civil liability on a factual misstatement whose content did not warn a

reasonably prudent editor or broadcaster of its defamatory potential."); id. (referring to "publisher

or broadcaster"); id. at 350 (referring to "danger of media self-censorship"); id. at 354 (Justice

Blackman concurring and joining the majority opinion because by requiring the New York Times

actual malice standard for recovery of presumed and punitive damages, the Court has left

"sufficient and adequate breathing space for a vigorous <u>press</u> . . . [which] will have little, if any

practical effect on the functioning of responsible <u>journalism</u>."); <u>id.</u> at 354-55 (Chief Justice

Burger dissenting; explaining that "[i]n today's opinion the Court abandons the traditional thread

so far as the ordinary private citizen is concerned and introduces the concept that the <u>media</u> will

be liable for negligence in publishing defamatory statements with respect to such persons";

further stating that he does not "know the parameters of a 'negligence' doctrine as applied to the

<u>news media</u>."); <u>id.</u> at 361 (Justice Brennan dissenting and explaining that he adheres to his

previously expressed view that the "proper accommodation between avoidance of <u>media</u> self-

censorship and protection of individual reputations" is met only by applying the <u>New York Times</u>

"standard in civil libel actions concerning <u>media</u> reports of the involvement of private individuals

in events of public or general interest.") (emphasis added, footnote omitted).

  Subsequent Supreme Court cases strongly suggest that the holdings in <u>Gertz</u> were

confined to media defendants and did not extend to a claim of defamation brought by a private

plaintiff against a non-media defendant when the issue was not a matter of public concern.  <u>E.g.</u>,

<u>Philadelphia Newspapers</u>, 475 U.S. at 768 (stating that "[i]n <u>Gertz</u>, the Court held that a private

figure who brings a suit for defamation cannot recover without some showing that the <u>media</u>

<u>defendant</u> was at fault in publishing the statements at issue.") (emphasis added); <u>Hutchinson v.</u>

<u>Proxmire</u>, 443 U.S. 111, 133 n.16 (1979) (noting that "[t]his Court has never decided . . . whether

the <u>New York Times</u> standard can apply to an individual defendant rather than to a <u>media</u>

<u>defendant</u>" and declining to address the issue) (emphasis added).

  Moreover, in <u>Philadelphia Newspapers</u>, the Court, in considering whether the common

law presumption that defamatory speech is false could stand when a private plaintiff seeks

17 - OPINION & ORDER

damages against a media defendant regarding speech on a matter of public concern, expressly stated that it was not considering what the standards would be with a non-media defendant.  475 U.S. at 777, 779 n.4 (holding that "the common-law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages against a media defendant for speech of public concern" and further stating that the Court had no "need [to] consider what standards would apply if the plaintiff sues a nonmedia defendant[.]").

Even Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749 (1985) (plurality opinion), and Citizens United v. Federal Election Commission, 130 S. Ct. 876 (2010), do not, as defendant contends, resolve any doubt generated by Gertz about whether the First Amendment issues Gertz addressed in the context of a private plaintiff's defamation claim relied on a distinction between a media defendant and a non-media defendant.  In Citizens United, the Court stated, as it had in previous cases, that "[w]e have consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers."  Citizens United, 130 S. Ct. at 905 (internal quotation marks omitted).  It also acknowledged, as the instant case makes very clear, that "[w]ith the advent of the Internet and the decline of print and broadcast media,. . . ., the line between the media and others who wish to comment on political and social issues becomes far more blurred."  Id. at 905-06.

But, the Citizens United Court was not addressing the "struggle to define the proper accommodation between the law of defamation and the freedoms of speech and press protected by the First Amendment."  Philadelphia Newspapers, 475 U.S. at 768 (internal quotation marks omitted).  Rather, its decision concerned a restriction enacted by Congress expressly directed to political speech by corporations.  The statements by the Citizens United majority regarding the

18 - OPINION & ORDER

constitutional treatment of the press were made in the context of discussing the statute's media

exemption.  Id. at 905-06.  There was no effort whatsoever by the Citizens United Court to

discuss the balancing of First Amendment interests by the speakers or writers of allegedly

defamatory statements with the equally valid state interest, recognized by the Supreme Court, of

"compensat[ing] [] individuals for the harm inflicted on them by defamatory falsehood." Gertz,

418 U.S. at 341, 342 (further noting the "tension . . . between the need for a vigorous and

uninhibited press and the legitimate interest in redressing wrongful injury."); see also Dun &

Bradstreet, 472 U.S. at 758 (noting that Gertz described the state interest in compensating

individuals for injury to their reputation as "strong and legitimate").  Thus, the comments by the

Citizens United Court are not pertinent to the First Amendment issues seen in the defamation

context.

         Even if I accepted defendant's proposition that Citizens United and other cases

categorically hold, for all purposes, that there is no distinction in the constitutional protections

afforded to media and non-media defendants, the question of what standard of liability to apply

to a private plaintiff who sues a non-media defendant over allegedly defamatory statements made

on a private issue, remains unanswered.  It is not enough to say that post-Gertz cases have held

that media and non-media defendants are treated alike because that statement fails to answer the

pivotal question in this case and fails to support the basis of defendant's motion:  that a

negligence standard, at a minimum, is required in all defamation claims even absent a public

figure, public official, matter of public concern, or a media defendant.

         Defendant suggests that the plurality opinion in Dun & Bradstreet is informative.  Dun &

Bradstreet presented the question of whether Gertz's damages holding (that presumed and

19 - OPINION & ORDER

punitive damages are not recoverable absent "actual malice"), "applies when the false and defamatory statements do not involve matters of public concern."  472 U.S. at 751.  Justice Powell, writing for three justices, answered the question in the negative, meaning that such damages were allowable without a showing of "actual malice" if the speech at issue did not involve a matter of public concern.  Id. at 761, 763 (noting that "[i]n light of the reduced constitutional value of speech involving no matters of public concern, we hold that the state interest adequately supports awards of presumed and punitive damages-even absent a showing of 'actual malice'" and "permitting recovery of presumed and punitive damages in defamation cases absent a showing of 'actual malice' does not violate the First Amendment when the defamatory statements do not involve matters of public concern.").

Chief Justice Burger and Justice White concurred with the holding.  Chief Justice Burger explained that he had dissented in Gertz because he "believed that, insofar as the 'ordinary private citizen' was concerned, the Court's opinion [in Gertz] abandoned the traditional thread that had been the theme of the law in this country up to that time."  Id. at 763-64 (internal quotation marks omitted).  However, accepting Gertz as "the law of the land," Chief Justice Burger concurred with Justice Powell's holding because he agreed that Gertz "is limited to circumstances in which the alleged defamatory expression concerns a matter of general public importance" and Dun & Bradstreet concerned expression which was related to a matter of private concern.  Id. at 764.

Justice White also concurred.  Tracing some of the history of the law of defamation, Justice White explained that New York Times "was the first major step in what proved to be a seemingly irreversible process of constitutionalizing the entire law of libel and slander."  Id. at 766.  He explained that while he joined the judgment and opinion in New York Times, and later

20 - OPINION & ORDER

joined decisions extending the New York Times standard to other situations, he "came to have increasing doubts about the soundness of the Court's approach and about some of the assumptions underlying it." Id. at 767.

Justice White noted that his dissent in Gertz asserted that "common-law defamation remedies should be retained for private plaintiffs." Id. He believed, as well, that the "common-law rules should have been retained where the plaintiff is not a public official or public figure" because, in his opinion, the "Court undervalued the reputational interest at stake in such cases." Id. at 772.

Because the holding reached by the three justices was a restriction of Gertz, Justice White concurred in the holding. He explained that he believed Gertz should be overruled and because the defamatory publication at issue did not deal with a matter of public importance, he joined in the decision authored by Justice Powell. Id. at 774.

Justice White also explained, however, that he thought it wise that Justice Powell's conclusion did not rest on the lower court's distinction between media and non-media defendants. Id. at 773. Justice White agreed with Justice Brennan that "the First Amendment gives no more protection to the press in defamation suits than it does to others exercising their freedom of speech." Id. He believed that none of the Court's cases supported such a distinction and that the Court had rejected it "at every turn." Id.

Four justices, including Justice Brennan, dissented. Id. at 774. The dissent concluded that the First Amendment required restraints on presumed and punitive damages, even for the private expression at issue in the case. Id. at 775-76, 796. The dissent agreed with Justice White that there should be no distinction between media and non-media defendants, stating, presciently,

21 - OPINION & ORDER

that "First Amendment difficulties lurk in the definitional questions such an approach would generate[,]" that "the distinction would likely be born an anachronism," and that such a distinction "misapprehends" the Court's cases. Id. at 782-83. Given that Justice White and the four dissenting justices shared the same disdain toward an analysis dependent on distinguishing media from non-media defendants, Justice Brennan noted that "six Members of this Court (the four who join this [dissenting] opinion and Justice White and The Chief Justice [Burger]), agree today that, in the context of defamation law, the rights of the institutional media are no greater and no less than those enjoyed by other individuals or organizations engaged in the same activities." Id. at 783-84.

Despite Justice Brennan's statement that six justices agreed that the jurisprudence surrounding the intersection of the First Amendment and the law of defamation did not rest on a distinction among defendants, in Philadelphia Newspapers, decided only ten months later, the Court majority continued to describe the Gertz holding as requiring a private plaintiff to show that the "media defendant was at fault[.]" Philadelphia Newspapers, 475 U.S. at 768 (emphasis added). The Court expressly stated that it was not considering what standards would apply if a private figure plaintiff sued a non-media defendant over statements regarding a matter of public concern. Id. at 779 n.4; see also Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 n.6 (1990) (noting that in Philadelphia Newspapers, the Court "reserved judgment on cases involving nonmedia defendants and accordingly we do the same."). Thus, even after Dun & Bradstreet, whether the law recognized a distinction between media and non-media defendants remained unclear.

More importantly, however, while six justices may have agreed in Dun & Bradstreet that

there should be no distinction among defendants in defamation cases, there was no agreement on what standard of liability to apply in purely private defamation cases (meaning those with no public official, no public figure, and no issue of public concern). As indicated above, it is not enough to say that the Court's cases support a conclusion that media and non-media defendants must be treated alike. Defendant's motion rests on the unsupported premise that the Court's cases require some degree of fault in all defamation cases.

Justices Brennan and his dissenting colleagues advocated for a broader application of the First Amendment and the <u>New York Times</u> standard. Presumably, those justices, had they been squarely presented with a private plaintiff and speech directed to a private issue, would have supported a higher standard of fault.[4] But, Chief Justice Burger and Justice White joined the three justice plurality opinion because they believed that <u>Gertz</u> strayed too far from the traditional common law rules governing defamation claims. Presumably, those justices, while endorsing the equal treatment of non-media and media defendants, would not have supported a higher degree of fault, even a negligence standard, to purely private defamation claims.

In the end, the Supreme Court, in my opinion, has not squarely held that a private figure plaintiff who sues a non-media defendant regarding allegedly defamatory statements made on a private issue, is required to demonstrate negligence to establish liability. While the cases suggest that a majority of the justices, at one time or another, including the present, agree that the media enjoys no special First Amendment privilege, the cases do not show that a majority of the Court

---

[4] <u>Dun & Bradstreet</u> concerned only the application of <u>Gertz</u>'s damages holding, meaning whether actual malice was required to recover presumed and punitive damages. Justice Brennan acknowledged that the case presented a narrow issue and that the parties themselves did not question the <u>Gertz</u> requirement that the plaintiff had to show fault to obtain a judgment and actual damages. 472 U.S. at 781.

has agreed that if defendants in defamation cases are to be treated alike, what follows as a matter of course is a fault requirement for all plaintiffs in all defamation cases, regardless of the status of the plaintiff or the defendant.  Without such agreement, the instructions given to the jury in this case were not plainly erroneous and the motion for new trial on this basis is denied.[5]

## II.  Oregon Statutes

*Amicus* Electronic Frontier Foundation (EFF) makes additional arguments beyond those raised by defendant.  I need not address these issues because "[i]n the absence of exceptional circumstances, . . . [courts]  do not address issues raised only in an amicus brief." Artichoke Joe's Cal. Grand Casino v. Norton, 353 F.3d 712, 719 n.10 (9th Cir. 2003).   However, even considering EFF's arguments, I reject them.[6]

EFF first argues that despite the clear statutory language of Oregon Revised Statute §

---

[5]  Defendant also cites to a footnote in a 1998 Ninth Circuit case citing Gertz for the proposition that "[a] private person who is allegedly defamed concerning a matter that is not of public concern need only prove, in addition to the requirements set out by the local jurisdiction, that the defamation was due to the negligence of the defendant." Newcombe v. Adolf Coors Co., 157 F.3d 686, 694 n.4 (9th Cir. 1998) (citing Gertz, 418 U.S. at 347).  As can be seen from the discussion above, it is less than clear that Gertz applied to non-media defendants and so, to the extent the Ninth Circuit failed to discuss that issue, this statement carries very little weight. More importantly, however, the statement was purely *dicta* because the court concluded that the plaintiff was either an all-purpose public figure or was a limited public figure.  Id.  Even more importantly, and overlooked by defendant here, is that Time, Inc., a media corporation, was a defendant in the case and therefore, the Ninth Circuit's statement about the law was made in the context of a case with a media defendant.  As a result, it has no relevance to the issue presented in the new trial motion.

[6]  Additionally, EFF fails to show how the alleged errors require a new trial.  There is no discussion in EFF's memorandum regarding how my rulings on Oregon's retraction statute or shield law were "contrary to the clear weight of the evidence," were "based upon false or perjurious evidence," or created "a miscarriage of justice."  Rather EFF suggests that it is concerned with "the message that the Court's rulings will send to the broader Internet community."  EFF Mem. at p. 7.  This is not a basis for a new trial.

(O.R.S.) 31.215 limiting the application of the retraction law to specific publications or broadcasts, I should expand the application beyond the express language adopted by the Oregon Legislature because an Internet publication is no different than the broad publication methods identified in the statutes.

When interpreting a statute, courts look first to the statute's plain meaning. Hutcherson v. Ariz. Health Care Cost Containmt. Sys. Admin, 667 F.3d 1066, 1070 (9th Cir. 2012). If the plain meaning is clear, the analysis ends and the plain meaning is applied. Id. There is no question that the terms in O.R.S. 31.215 are clear and unambiguous. Notably, the Oregon Legislature included specific types of publications or broadcasts in describing the publications or broadcasts subject to the statute's protections. The Legislature did not simply say "publications" or "broadcasts," but instead, delineated specific types of media in which the statements had to occur before they received protection. While the structure and purpose of a statute provide guidance in determining the plain meaning, Cooper v. FAA, 622 F.3d 1016, 1020 (9th Cir. 2010), cert. granted, 131 S. Ct. 3025 (U.S. June 20, 2011) (No. 10-1024), it is inappropriate for a court to expand a statute beyond what the legislature intended. E.g., Marx v. Gen. Revenue Corp. No. 10-1363, 2011 WL 6396478, at * 11 (10th Cir. Dec. 21, 2011) (not the court's role to expand on statute's regulation of the manner in which a debt collector makes contact with third parties); see also Life Receivables Trust v. Syndicate 102 at Lloyd's of London, 549 F.3d 210, 216 (2d Cir. 2008) ("A statute's clear language does not morph into something more just because courts think it makes sense for it to do so.").

Here, even assuming that the Oregon Legislature's purpose in passing the retraction statute was to protect statements made in a broad range of media outlets existing at that time, I

cannot discern from this purpose that today's Oregon Legislature would expand the statute's protection to all statements published on the Internet. Statements on the Internet range from those made by traditional print publications such as daily newspapers (e.g., nytimes.com), to those more typically associated with a community bulletin board (e.g., craigslist.com). Given the breadth of the fora available on the Internet, one cannot presume that today's Oregon Legislature would amend the retraction statute to include all statements made there. Determining what statements made on the Internet deserve protection under the retraction statute involves a social policy discussion which is a function belonging solely to the legislature. This is not an issue for the courts.

EFF next argues that my conclusion regarding the shield law, O.R.S. 44.510 - 44.540, was unnecessary to reach and erroneous as a matter of law. EFF suggests that defendant's prior disclosure of the source of her statements and her representation that the source had "nothing to do with the blog post I am on trial for," rendered moot any issue regarding the source of defendant's statements. However, defendant subsequently raised the shield law in her trial memorandum. While the relevance of the shield law to the trial proceedings was less than clear, I understood her reliance on the statute in her trial memorandum to mean that she intended to use it in some form at trial, and thus, a ruling was required.[7]  Moreover, for the reasons explained above regarding the retraction statute, it is inappropriate for me to expand the Oregon Legislature's admittedly broad definition of "[m]edium of communication" to cover all communications made on the Internet.

---

[7] Additionally, the lack of clarity in defendant's filing prompted the ruling under O.R.S. 44.520(3) because as a result of the trial memorandum's reliance on the shield law, I assumed defendant was going to assert a defense based on the content or source of the statements.

III.  Amount of the Jury Award

    A.  Standards for Evaluating

      Defendant argues that she is entitled to a new trial, or a remittitur, because there is no

evidence in the record to support the $2.5 million jury verdict awarded to plaintiffs.  In assessing

an argument that the award is against the weight of the evidence, a "stringent standard applies"

and a new trial may be granted "only if the verdict is against the great weight of evidence or it is

quite clear that the jury has reached a seriously erroneous result."  Digidyne Corp. v. Data Gen.

Corp., 734 F.2d 1336, 1347 (9th Cir. 1984) (citation and internal quotation marks omitted).  The

"district court may not grant a new trial simply because it would have arrived at a different

verdict."  Silver Sage Partners v. City of Desert Hot Springs, 251 F.3d 814, 819 (9th Cir. 2001).

Rather, the "trial court must have a firm conviction that the jury has made a mistake."  Landes

Constr. Co. v. Royal Bank of Can., 833 F.2d 1365, 1372 (9th Cir. 1987).  When evaluating the

motion, the court may weigh the evidence, evaluate the credibility of the witnesses, and is not

required to view the evidence from the perspective most favorable to the prevailing party.  United

States v. Kellington, 217 F.3d 1084, 1095 (9th Cir. 2000).

      In assessing whether the damages awarded are excessive, a court may grant a motion for

new trial if the award is "grossly excessive or monstrous, clearly not supported by the evidence,

or based only on speculation or guesswork."  Snyder v. Freight, Const., Local No. 287, 175 F.3d

680, 689 (9th Cir. 1999) (internal quotation marks omitted).  A trial court reviewing a damages

award attacked as excessive must consider the evidence of damages in a light most favorable to

the prevailing party.  Seymour v. Summa Vista Cinema, Inc., 809 F.2d 1385, 1387 (9th Cir.),

amended on other grounds, 817 F.2d 609 (9th Cir. 1987).  If the court concludes that a damages

27 - OPINION & ORDER

award is excessive, it may either grant the defendant's motion for a new trial, or deny the motion, conditioned upon the prevailing party's acceptance of a remittitur.  Silver Sage Partners, 251 F.3d at 818.

     B.  Discussion

     Defendant argues that the trial concerned a single blog post and that plaintiffs failed to establish that any damage flowed from that post as opposed to other related posts which expressed opinion or appeared on other websites.  Defendant notes that plaintiffs' witness Patricia Whittington expressly stated that she did not know whether any of the damages flowed from the actionable post.  Dkt #102 at p. 109 (witness stated she did not have information proving "actual revenue loss due to this exact blog post"); but see id. at p. 107 (estimating that the advisory business of Obsidian Finance was $1 million down in 2011).

     Defendant also points to the testimony of David Brown, one of the principals of Obsidian Finance, who explained to the jury that the vice-president of a bank that Obsidian looked to for financing of a solar project, had completed a Google search of Obsidian and found "stuff" that was "troubling."  Id. at p. 161.  The bank vice-president called Brown and they talked about "various blog postings" that he had come across.  Id.  Brown explained to the bank vice-president that the blogs were "all kind of connected," and that they were made by a "woman in Montana who was kind of on a mission to discredit Obsidian[.]"  Id. at pp. 161-62.  Brown responded to the bank vice-president's questions about whether the blog postings were true.  Id. at p. 162.  Brown described being stymied by the bank vice-president's questions about why this was occurring and "what was there about Obsidian" that caused this to happen.  Id.  Brown tried to assure him that this was very unusual, Obsidian did not typically have these problems, but "these

things just happen out there in cyberspace." Id.

In the end, Brown did not believe he was successful in reassuring the bank vice-president regarding his concern that as a result of doing business with Obsidian, the bank would not be subject to similar blog postings. Id. Brown explained to the jury that the bank vice-president's concern was not that Obsidian had committed tax fraud, but that there would be an impact to the bank's or the vice-president's reputation as a result of adding Obsidian as a "new customer." Id. at p. 163. Brown testified that Obsidian did not get the loan. Id.

Defendant argues that as this evidence shows, there is no basis for concluding that the single actionable post inflicted $2.5 million in damages on plaintiffs and thus, the jury's verdict must have been based on numerous posts which have been found to be constitutionally protected. Additionally, defendant notes that in closing argument, plaintiffs' counsel stated that the decline in Obsidian Finance's advisory business was related to defendant's having posted on "numerous websites" and that the award is more than twice what plaintiffs' counsel argued to the jury was reasonable compensation. Id. at p. 186 (referring generally to the fact that defendant "posted on numerous websites"); id. at p. 192 (telling jury that while it was up to them to decide the amount of reasonable compensation, a reasonable figure was the $1 million Whittington referred to).

In response, plaintiffs note that the only blog post in evidence at the trial was the December 25, 2010 post made on bankruptcycorruption.com. See Dkt #73 (Pls.' Ex. List, Ex. 1A); Dkt #91 (Clerk's List of Exs. and Witnesses showing Ex. 1A received into evidence). That post accused plaintiffs of criminal conduct in connection with a professional engagement involving the liquidation of a bankruptcy estate. Plaintiffs also point to the following testimony:

(1) Defendant testified[8] that she posted the blog post first on December 24, 2010, on

obsidianfinancesucks.com, and then the next day on bankruptcycorruption.com. Dkt #102 at p.

166. After that, she believes she posted it on ethicscomplaint.com and several other blogs. Id.

She explained that

> I have feeds on all my sites. I Twitter. It goes everywhere. I would assume, at
> this point, it's a lot of places, yeah, more than 10. . . . Once I post on my blog, it
> goes to Twitter. It goes viral. Lots of people . . . take my feed and put it on their
> blog. And I also have other blog authors that put it on their blog. It just kind of
> goes, and people just pick up my story. And since this case, a lot of people have
> picked it up and reposted it.

Id. at pp. 166-67.

(2) Defendant further testified that she is "very good" at getting everything she writes to

appear as a top response to a search inquiry. Id. at p. 177. When asked to describe how she was

able to accomplish this, she refused to answer because it was "proprietary." Id. (further testifying

that "[e]very single word I write, I go for the top ranking, absolutely. Anything else would just

be ridiculous, really."). She explained that in regard to "the post" she did about plaintiffs and the

Summit bankruptcy case, she followed her "normal practice to try to get to the top ranking," and

stated that she "interlock[s] all of my blog posts in a proprietary way that gets to the top of the

search engines for every search term that I go for[.]" Id. at p. 178.

(3) Defendant could, if she wanted, cause her postings to not be at the top of a search. Id.

at p. 177. She also has the ability to retract any blog posts still within her control, probably

within a day. Id. at pp. 167-68.

(4) On or about December 22, 2010, defendant received a letter from plaintiffs telling her

---

[8] Defendant's testimony was offered via deposition.

that she was falsely accusing plaintiffs of tax fraud.  Id. at pp. 170-72.  Three days later, she

posted the actionable statements on bankruptcycorruption.com.  Id.

(5)  As of the day of trial, the post was still on bankruptcycorruption.com.  Id. at pp. 88-

89 (Padrick testimony).  It was also on a site called ethicscomplaint.com, the title of which

implied that site's legitimacy.  Id. at p. 89.

(6) Given the nature of plaintiffs' business, plaintiffs' reputation is critical, and they would

expect potential clients and business partners to use the Internet as a search tool.  Id. at pp. 76-77.

Anything on the Internet that suggested that plaintiffs were not trustworthy or somehow were not

reputable, would be a "red flag" for potential clients and would damage plaintiffs' business.  Id. at

p. 77; see also id. at pp. 125-29 (expert testimony explaining that it would be probable that

potential buyers of a service offered by Obsidian Finance would use the Internet as an

information source and that because the risk taken by such buyers is high, meaning that if the

wrong provider of the service is chosen serious consequences could ensue, trust and reputation

are "extremely important" in making a decision to hire such a firm); id. at pp. 146-47 (reputation

for being competent and trustworthy is extremely important to the success of Obsidian Finance).

(7) Obsidian Finance has both advisory clients and investment clients.  Id. at p. 87.

Padrick testified that defendant's false statements caused significant damage, particularly on the

advisory side, but that the damage had spilled over to the investment side as well.  Id.  A typical

advisory client engagement generates revenues of at least $100,000 and up to $5 million, with

some bringing in more than $5 million.  Id. at p. 88.  Defendant's statements have caused  the

advisory work to drop to almost nothing, with only one new advisory assignment in 2011.  Id. at

pp. 88, 92.  Because 2011 saw a period of economic distress, plaintiffs would normally be

involved in the "greatest amount of advisory business." Id.

(8) In response to questioning by defendant, Padrick indicated that he had "specific examples" of Obsidian Finance failing to retain a new client who had been referred by a current client, when the new client had asked the current client about defendant's blog post. Id. at pp. 92-93. He also indicated that he could provide examples of trying to start and fund new businesses, but the clients reported being afraid that defendant will "go after them," or that the "damage as a result of that blog post will cause their business to be adversely impacted by our reputation." Id. at p. 93. Defendant did not inquire further about these examples.

(9) Padrick testified that the December 25, 2010 blog post caused him financial harm and would cause him significant harm for the entirety of his career. Id. at p. 91.

When looking at all the evidence in the trial record, substantial evidence supports the jury's award in this case. Obsidian Finance's success is built on its reputation. It is reasonable to assume that potential clients will research the firm on the Internet. There was testimony confirming that potential clients had, in fact, seen statements about plaintiffs on the Internet. Defendant made the post having been fully informed that plaintiffs alleged the tax fraud statements to be false. She purposefully manipulated the posts to give them the most prominence in response to a search query. The post was still on the bankruptcycorruption.com site on the day of trial.

Although the verdict was more than plaintiffs' counsel suggested was reasonable, that does not make it "grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." Here, the jury learned that since the blog post was made, there had been a $1 million drop in revenue in the advisory side of the business. As Padrick

32 - OPINION & ORDER

explained, 2011 should have been a very strong year for this part of the business.   Padrick

indicated that advisory clients sometimes generated $5 million or more in revenue.   Thus, it was

not unreasonable for the jury to assume that the $1 million drop Whittington testified to did not

fully account for all of the lost advisory business.  Whittington's figure also failed to take into

account any drop in the investment side of the business which Padrick described had occurred as

result of defendants' post.

Additionally, Padrick testified that defendant's blog post would cause him significant

harm for the rest of his career.  The jury could have reasonably relied on the facts that the blog

post at issue "went viral" (in defendant's own words), was still posted on

bankruptcycorruption.com on the day of trial, and would continue to be a top response in any

Obsidian or Padrick search query, in assessing any future harm that the post caused Obsidian

Finance and Padrick.  The jury could have also reasonably relied on defendant's failure to use her

knowledge to retract the post or to make the post not appear "front and center" in response to a

search, in assessing future harm to plaintiffs.

While there were occasional references to "posts" in the plural, the majority of the

evidence at the trial was directed to this single blog post and the harm it created.  The evidence

supports the damages awarded to each of the plaintiffs.  The amount of damages does not support

defendant's motion for a new trial or her request for a remittitur.

/ / /

/ / /

/ / /

/ / /

33 - OPINION & ORDER

CONCLUSION

Defendant's motion for new trial [105] is denied.

IT IS SO ORDERED.

Dated this __27th__ day of __March_____, 2012

_/s/ Marco A. Hernandez_____
Marco A. Hernandez
United States District Judge

34 - OPINION & ORDER